# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| YOLANDA JEANETTE STARKS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:15-cv-00677 |
| | ) | Senior Judge Haynes |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff, Yolanda Jeanette Starks, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 13) contending, in sum, that the Administrative Law Judge ("ALJ") erred by assigning significant weight to consultative examiners and little weight to treating physicians. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

On July 11, 2011, Plaintiff's social security claim was denied following a hearing. Id. at 68-81. Plaintiff requested reconsideration of this decision on July 9, 2012. (Docket Entry No. 11, Administrative Record, at 95-97). This request was denied on August 30, 2012. Id. at 98-101. On September 13, 2012, Plaintiff requested a hearing before an ALJ. Id. at 102. On September 21, 2012, this request was granted and a hearing was set for November 14, 2013. Id. at 103-07.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for SSI using the sequential

evaluation process set forth at 20 C.F.R. § 416.920. Id. at 25-26.[1]

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 8, 2012, the application date. Id. at 26.

At step two, the ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease, bilateral knee pain, obesity (stated height of 5'6" and weight in the range of 237-278 pounds) and bipolar disorder. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 27.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work except she can sit, stand and walk for four hours at one time for a total of six hours each in an eight-hour workday. The claimant can frequently reach with her right upper extremity and frequently push/pull with the bilateral upper extremities. She can frequently stoop and climb ramps or stairs and occasionally crouch, kneel and crawl. The claimant can never climb ladders, ropes or scaffolds. She can tolerate occasional exposure to moving machinery and vibrations, but cannot tolerate any exposure to unprotected heights. She has no limitations in understanding and memory. The claimant can maintain concentration, persistence and pace for low-level detailed tasks over a normal workday with appropriate breaks. Additionally, she has no limitations in social interaction and can adapt to routine changes in the workplace. Id. at 28-29.

At step five, the ALJ stated that Plaintiff has no past relevant work, but that there are jobs

---

[1]The Court's citations are to the pagination in the electronic case filing system, not in the Administrative Record.

that exist in significant numbers in the national economy that the claimant can perform. Id. at 34. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to benefits. Id. at 35. Following this decision, Plaintiff requested a review. Id. at 11-20. On April 18, 2015, the Appeals Council denied Plaintiff's request for review. Id. at 5-10.

## A. Review of the Record

On December 9, 2010, Plaintiff had an initial visit with Dr. Harry Bonnaire. Id. at 254-55. Plaintiff was "looking for a new [primary care physician]" and "needs med refill (Promethazine, Alprazolam, Cimetidine)." Id. at 254. Plaintiff admitted to smoking "half a pack a day for 4 years" and "blames it on stress;" Plaintiff had recently been admitted to the emergency room for "bronchitis due to smoking." Id. Plaintiff reported a history of "reflux, heartburn, high blood pressure but she claims it stays stable. Also complains of anxiety. She gets therapy, Xanax: 3 halfs a day." Id. Upon examination, Plaintiff "had back pain and history of Degenerative Disc disease for 6 years" and "anxiety and receives medication: Xanax and therapy." Id. Plaintiff was diagnosed with "[d]egeneration of intervertebral disc, site unspecified," "[u]nspecified chest pain," "[l]umbago," "[a]nxiety state, unspecified," "[o]besity," "[a]llergic rhinitis due to other allergen," "[e]pistaxis" and "[a]cute bronchitis." Id. at 254-55. Plaintiff underwent an EKG that "show[ed] non specific t wave abnormality" and a pulmonary function test that "show[ed] severe obstructive lungs disease." Id. at 255. Plaintiff was prescribed Cimetidine, an anti-acid, Atenolol, a blood pressure medication, Flovent, an asthma medication, and Zoloft, an anti-depressant. Id.

On January 11, 2011, Plaintiff visited Karen Henderson, PA at Dr. Bonnaire's office "to discuss her medication for her anxiety[. Plaintiff] states her dosage was written wrong." Id. at 253. Plaintiff stated that she "has been on 1mg of xanax for ~ 6-7 years" but when she "turned in" her last

3

refill "she thought it was 0.5mg ... says that she took ~4 [because] was taking them to equal 1 mg." Id. Plaintiff did not bring the bottle with her, but was told that "if she turn[s] in the meds she can pick up a prescription of xanax 1 mg [by mouth] [every day] #28 pill no [refill]." Id.

On February 14, 2011, Plaintiff visited Mark Compton, PA at Dr. Bonnaire's office "for [hypertension], anxiety, GERD and refills. [Plaintiff] doing well otherwise and is 10 days postpartum and doing well." Id. at 252. Plaintiff was diagnosed with "[u]nspecified essential hypertension," "[g]eneralized anxiety disorder" and "[e]sophageal reflux." Id. Plaintiff's prescriptions for Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id.

On March 14, 2011, Plaintiff visited Dr. Bonnaire for "refills of her atenolol, cimetidine, and alprozolam medications. ... There are no acute complaints." Id. at 250-51. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" but did report "anxiety episodes." Id. at 250. Plaintiff was diagnosed with "[a]nxiety state, unspecified," "[u]nspecified essential hypertension" that was "stable," "[o]besity" and "[e]sophageal reflux." Id. at 250-51. Plaintiff's prescriptions for Alprazolam, or Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id. at 251.

On April 13, 2011, Plaintiff visited Mark Compton at Dr. Bonnaire's office "for refill of Xanax. [Plaintiff] states she will see the psychiatrist in one week. [Plaintiff] states she was doing well otherwise." Id. at 248-49. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no parathesias or numbness" and showed "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. at 248. Plaintiff was diagnosed with

4

"[u]nspecified essential hypertension," "[e]sophageal reflux" and "[g]eneralized anxiety disorder." Id. Plaintiff's prescription for Xanax was renewed and Compton wrote that Plaintiff "will [see] psychiatrist in 1 week[.]" Id. at 249.

On April 19, 2011, Plaintiff visited Nashville Health Services complaining of lower back pain. Id. at 274-75. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with appetite and sleep, and in all other activities experienced "no interference." Id. at 275. Plaintiff wrote that her "pain level at its worst during the past week" was a nine or ten, "at its best" was a five, and "over all during the past week" was a five. Id. Plaintiff reported that her current treatment was "making a difference," and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On May 13, 2011, Plaintiff visited Mark Compton at Dr. Bonnaire's office "for anxiety and refill of Xanax. [Plaintiff] saw psychiatrist and therapist and they will begin her meds in one month. [Plaintiff] doing well otherwise." Id. at 245-46. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and showed "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. at 245. Plaintiff was diagnosed with "[u]nspecified essential hypertension," "[e]sophageal reflux" and "[g]eneralized anxiety disorder." Id. Plaintiff's prescription for Xanax was refilled, although Compton noted that Plaintiff's prescription was for "1/2 tab[let] [twice a day]" and "[Plaintiff] was taking 1/2 [three times a day] and ran out early so it is not showing up in her urine – I have discussed this with her and our office policy..." Id. at 246. Compton also wrote that "[Plaintiff] saw

psychiatrist and therapist and they will begin her meds in one month." Id.

On May 19, 2011, Plaintiff visited Nashville Health Services complaining of lower back pain. Id. at 272-73. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with sleep, and in all other activities experienced "no interference." Id. at 273. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On June 1, 2011, Plaintiff attended a hearing to determine eligibility for Social Security benefits. Id. at 71.

On June 13, 2011, Plaintiff visited Mark Compton at Dr. Bonnaire's office "for [generalized anxiety disorder], [hypertension] and med refills." Id. at 243-44. Plaintiff reported that she was "doing well today with no new complaints." Id. at 243. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and showed "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[d]egeneration of intervertebral disc, site unspecified," "[l]umbago," "[a]llergic rhinitis due to other allergen," "[u]nspecified essential hypertension," and "[g]eneralized anxiety disorder." Id. Plaintiff's prescriptions for Alprazolam, or Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id. at 244.

On July 12, 2011, Plaintiff visited Dr. Bonnaire "for medication refill (Xanax)." Id. at 242. Plaintiff reported "increase[d] fatigue for the past 3 weeks" due to "taki[]ng care of grand

daughter[.]" Id. Upon examination, Plaintiff had "[n]o joint or back pain or muscle problems" and a "[history] of anxiety no depression." Id. Plaintiff was diagnosed with "[d]egeneration of intervertebral disc, site unspecified," "[m]alaise and fatigue," "[a]nxiety state, unspecified," "[o]besity," and "[u]nspecified essential hypertension." Id. Plaintiff's current prescriptions were listed as Alprazolam, or Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication but no refills were prescribed. Id.

On August 12, 2011, Plaintiff visited Kristen Colby at Dr. Bonnaire's office for "medication refills and recheck." Id. at 241. Plaintiff was "doing well" and had "no stated complaints." Id. Plaintiff was diagnosed with "[a]nxiety state, unspecified," "[o]besity," "[u]nspecified essential hypertension," and "[g]eneralized anxiety disorder." Id. Plaintiff's prescriptions for Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id.

On August 16, 2011, Plaintiff visited Susan Kohn, NP at Nashville Health Services complaining of "pain." Id. at 268. Upon examination, Plaintiff reported "[lower back pain] knees" that was "sharp" in quality, but showed "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago, [d]egeneration of lumbar or lumbosacral intervertebral disc," "[s]coliosis [and kyphoscoliosis], idiopathic" and "[o]besity, unspecified." Id. Plaintiff was prescribed Lortab, an opiod pain medication. Id.

On September 13, 2011, Plaintiff visited Dr. Bonnaire "for medication refill (Xanax)." Id. at 240. Upon examination Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness." Id. Plaintiff was diagnosed with "[d]egeneration of intervertebral disc, site unspecified," "[a]nxiety state, unspecified," "[o]besity," and "[u]nspecified essential hypertension." Id. Plaintiff's prescriptions for Alprazolam, or Xanax, an anti-anxiety,

Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id.

On September 14, 2011, Plaintiff visited Susan Kohn at Nashville Health Services complaining of "pain." Id. at 267. Upon examination, Plaintiff reported "[lower back pain] knees" of a "sharp" quality but had "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[d]egeneration of lumbar or lumbosacral intervertebral disc," "[s]coliosis [and kyphoscoliosis], idiopathic" and "[o]besity, unspecified." Id. Plaintiff was prescribed Lortab, an opiod pain medication. Id.

On October 4, 2011, Plaintiff visited Outpatient Diagnostic Center of Nashville for a lumbar MRI. Id. at 313. The MRI revealed an issue at L4-5 and "disc degradation with broad-based bulge but no significant stenosis." Id.

On October 13, 2011, Plaintiff visited Dr. Bonnaire "for medication refill." Id. at 238-39. Plaintiff "states she is doing well" and "her only complaint is that she isn't sleeping at night." Id. at 238. Upon examination, Plaintiff's "[b]ack pain [wa]s the same, no limitation of range of motion, no parathesias or numbness." Id. Plaintiff also displayed "depressive symptoms, patient is only sleeping 1 to 2 hours a night, no changes in thought content." Id. Plaintiff was diagnosed with "[d]egeneration of intervertebral disc, site unspecified," "[a]nxiety state, unspecified," "[o]besity," "[u]nspecified essential hypertension," "[e]sophageal reflux," and "[g]eneralized anxiety disorder." Id. Plaintiff's prescriptions for Alprazolam, or Xanax, an anti-anxiety, Cimetidine, an anti-acid, and Atenolol, a blood pressure medication, were renewed. Id. at 238-39.

On October 17, 2011, Plaintiff visited Nashville Health Services complaining of lower back pain and knee pain. Id. at 265-66. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with walking, riding in an automobile,

recreational activities and mood and "severe intolerance" with ability to concentrate, sleep and "over all enjoyment of life;" none of the activities were marked "no interference" or "total interference which means they cannot do this activity at all due to the pain." Id. at 266. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On November 15, 2011, Plaintiff visited Nashville Health Services complaining of lower back pain and knee pain. Id. at 263-64. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "no interference" with walking, riding in an automobile, appetite and sleep and "severe interference" with mood and ability to concentrate; none of the activities were marked "total interference which means they cannot do this activity at all due to the pain." Id. at 264. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On December 8, 2011, Plaintiff visited Dr. Bonnaire to "re[-]evaluate [hypertension], reflux." Id. at 236-37. Plaintiff "states that she is generally stressed about taking care of family by herself without partner who is incarcerated." Id. at 236. Plaintiff admitted to not checking her blood pressure daily or exercising daily. Id. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed

with "[u]nspecified essential hypertension," "[d]egeneration of intervertebral disc, site unspecified," "[l]umbago," "[a]nxiety state, unspecified," "[o]besity," "[e]sophageal reflux" and "[g]eneralized anxiety disorder." Id. Plaintiff's medications were continued, specifically Hydrochlorothiazide, a blood pressure medication, and Dr. Bonnaire discussed diet and exercise with Plaintiff. Id. at 237.

On December 13, 2011, Plaintiff visited Nashville Health Services complaining of lower back pain and knee pain. Id. at 261-62. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "no interference" with walking, riding in an automobile, relations with other people, stamina and sexual activity, "moderate interference" with relations with other people – Plaintiff also marked this activity as "no interference" – mood, ability to concentrate, appetite and sleep, and "severe intolerance" recreational activities; none of the activities were marked "total interference which means they cannot do this activity at all due to the pain." Id. at 262. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Yet Plaintiff also wrote that her "current treatment [was] making a difference in [her] life." Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On December 22, 2011, Plaintiff visited Dr. Fakhruddin's office. Id. at 321. Plaintiff discussed how to "deal when get[s] angry." Id.

On January 10, 2012, Plaintiff visited Nashville Health Services complaining of lower back pain and knee pain. Id. at 259-60. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with mood, ability to concentrate, stamina and sexual activity and "severe intolerance" with walking, riding in an automobile, recreational

activities, appetite and sleep; none of the activities were marked "total interference which means they cannot do this activity at all due to the pain." Id. at 260. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Yet Plaintiff also wrote that her "current treatment [was] making a difference in [her] life." Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On January 19, 2012, Plaintiff visited Dr. Fakhruddin's office and "[s]aid her mood swing improving – does not loose (sic) temper easily like before – the sound [and] visual (hallucinations) improved[.]" Id. at 321. Plaintiff discussed "how to act when get upset." Id.

On February 16, 2012, Plaintiff cancelled an appointment at Dr. Fakhruddin's office because she "has another appt conflict." Id. On February 23, 2012, Plaintiff visited Dr. Fakhruddin's office and "[t]alked about the conflict [with] her boyfriend – mainly because of transportation problem – he came out of jail 6 months ago." Id. Plaintiff reported that "she sees shadow after argument – also has panic attack." Id. The provider wrote that "[w]e dealt [with] her how to resolve problem [and] [lower] stress[.]" Id.

On March 2, 2012, Plaintiff visited Mark Compton at Dr. Bonnaire's office for "medication refill." Id. at 234-35. Plaintiff was "doing well otherwise." Id. at 234. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[u]nspecified essential hypertension," "[e]sophageal reflux," and "[o]besity." Id. Plaintiff's prescriptions for Cimetidine, an anti-acid, Atenolol, a blood pressure

medication, and Hydrochlorothiazide, another blood pressure medication were renewed. Id. at 235.

On March 14, 2012, Plaintiff visited Nashville Health Services complaining of low back pain, knee pain, a swollen ankle, and arm and elbow pain. Id. at 257-58. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "no interference" with appetite or sleep, "moderate interference" with walking, riding in an automobile, recreational activities and ability to concentrate, "severe interference" with relations with other people, mood, stamina and sexual activity; none of the activities were marked "total interference which means they cannot do this activity at all due to the pain." Id. at 258. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, and "at its best" was a five. Id. Yet Plaintiff also wrote that her "current treatment [was] making a difference in [her] life." Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On April 3, 2012, Plaintiff visited Dr. Fakhruddin and "[s]aid her relationship won't work – she is ready to break up" because her boyfriend did not work. Id. at 320.

On April 11, 2012, Plaintiff visited Nashville Health Services with complaints of lower back, knee, and ankle pain. Id. at 357-58. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "total interference" with sexual activity and sleep – although she had originally marked both of these as "no interference" – "severe interference" with relations with other people, mood, ability to concentrate, and stamina, "moderate interference" with "general," walking, riding in an automobile, recreational activities, and "over all enjoyment of life," and "no interference" with appetite. Id. at 358. Plaintiff wrote that her "pain level at its worst during the past

week" was a ten, "at its best" was a five, and "over all during the past week" was a seven or eight. Id. Plaintiff reported that current treatment was "making a difference" in her life but that "meds helps (sic) but is not strong enough at times." Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On April 30, 2012, Frank Kupstas, Ph.D. completed a "psychiatric review technique" of Plaintiff. Id. at 277-89. Dr. Kupstas evaluated Plaintiff's record for an "affective disorder," specifically borderline affective disorder. Id. at 277, 280. Dr. Kupstas opined that Plaintiff had a mild limitation in "restriction of activities of daily living" and "difficulties in maintaining social functioning," and a moderate limitation in "difficulties in maintaining concentration, persistence, or pace." Id. at 287.

On April 30, 2012, Dr. Kupstas also completed a "medical consultant analysis." Id. at 290-94. Dr. Kupstas wrote that a "[s]ignificant change (improvement/worsening/new impairment) did occur," specifically, "[Plaintiff] presents [with] depressive [symptoms] – and current op psy[chiatric] [treatment] [is] [prescription] regimen from psychiatrist. Able to perform wide range of [activities of daily living] independently. Based on p[re]ponderance of [medical evidence of record], significant change did occur. ALJ decision (non-severe) is not adopted." Id. at 291.

On April 30, 2012, Dr. Kupstas also completed a third evaluation, a mental residual functional capacity assessment ("RFC"). Id. at 295-97. Dr. Kupstas opined that Plaintiff was "moderately limited" in her "ability to maintain attention and concentration for extended periods," "ability to perform activities within a schedule, maintain regular attendance, and be punctual within

13

customary tolerances" and "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Id. at 295-96. In all other areas, Dr. Kupstas opined that Plaintiff was "not significantly limited." Id. Dr. Kupstas concluded that Plaintiff was "able to maintain [concentration, persistence, and pace] for low-level detailed tasks over a normal workday [with] appropriate breaks" and was "able to adapt to routine changes in the workplace." Id. at 297.

On May 1, 2012, Plaintiff visited Dr. Fakhruddin and reported that her "boyfriend got locked up for DUI ... she was ready to break up last time." Id. at 320. Plaintiff reported pain and Dr. Fakhruddin "dealt [with] her to [lower] stress." Id.

On May 16, 2012, Plaintiff visited Nashville Health Services with complaints of lower back, knee, and ankle pain. Id. at 355-56. Plaintiff reported that she was not a tobacco user. Id. at 355. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with mood, sexual activity, appetite and sleep, "moderate interference" with "general," walking, riding in an automobile, recreational activities, relations with other people, ability to concentrate, and stamina, and "no interference" with "over all enjoyment of life." Id. at 356. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a seven. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On May 24, 2012, Plaintiff cancelled an appointment with Dr. Fakhruddin. Id. at 320.

On June 1, 2012, Plaintiff visited Mark Compton at Dr. Bonnaire's office "for GERD, [hypertension] and refills. [Plaintiff] doing well with no new complaints." Id. at 375-76. Plaintiff was diagnosed with "[u]nspecified essential hypertension," "[g]eneralized anxiety disorder," and "[e]sophageal reflux." Id. at 375. Plaintiff's urine drug screen was "pos[itive] [for] benzo[diazepines]" and Dr. Bonnaire's office made a note to follow up with Psychiatry and Pain Management. Id. Plaintiff was prescribed Atenolol, a beta blocker, Hydrochlorothiazide, a blood pressure medication, and Cimetidine, an anti-acid. Id. at 376.

On June 4, 2012, Plaintiff visited Dr. Fakhruddin's office. Id. at 320. Plaintiff reported that her "[b]oyfriend [was] still in jail ... She is not going to let him return" and that this situation made her feel "disappointed [and] angry[.]" Id. Plaintiff stated that she "still sees shadow – feels she is 'crazy.'" Id.

On June 4, 2012, Dr. Bonnaire's office called Plaintiff and left a message stating that the office had "called [in] a [potassium] prescription for this patient. [S]he need[s] to return on [T]uesday for repeat [p]otassium[]." Id. at 374.

On June 14, 2012, Plaintiff visited Outpatient Diagnostic Center of Nashville for cervical spine radiographs. Id. at 314. Plaintiff reported a "[r]emote injury" and "[p]ain." Id. The radiographs showed that "[t]here is maintenance of vertebral body height and alignment with the exception of reversal of cervical lordosis. This can be due to muscular spasm versus positioning. No fractures or subluxation noted. Neural foramina have normal appearance, prevertebral soft tissue planes and odontoid process are normal." Id. Plaintiff also underwent a radiological examination of her right elbow due to a "[motor vehicle accident] 2004, pain." Id. at 315. This examination showed a "[r]adiographically intact right elbow." Id.

On June 14, 2012, Plaintiff also visited Nashville Health Services with complaints of knee and ankle pain. Id. at 353-54. Plaintiff admitted that she was a tobacco user. Id. at 353. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with recreational activities, mood, and sleep, "moderate interference" with walking, ability to concentrate, and stamina, and "no interference" with riding in an automobile, relations with other people, sexual activity, and appetite. Id. at 354. Plaintiff wrote that her "pain level at its worst during the past week" was a ten and "at its best" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On June 14, 2012, Dr. Larry McNeil of Disability Determination Services conducted a case analysis. Id. at 298-302. Dr. McNeil considered the recent medical record since Plaintiff's claim was denied by the ALJ. Id. at 299. Dr. McNeil wrote, "MSK - Due West Medical Clinic 9/13/11 & 10/13/11 visits for med refills. 12/8/11 no pain alleged, extremities - [full range of motion] & neuro[logy] [normal]. 3/2/12 present for med refill, no vision problem reported, no pain reported, exam unchanged from 12/8/11. No further mention of avulsion [fracture]. [High blood pressure] - BP of 3/2/12 - 115/79 & no LL end organ damage. Vision not recorded. Obesity - [height] 66 inches, [weight] 273.1 lbs." Id. Based upon this information, Dr. McNeil concluded that there had been "[n]o change since the evaluation at ALJ decision." Id.

On June 14, 2012, Dr. McNeil also completed a physical RFC. Id. at 303-311. Dr. McNeil listed Plaintiff's primary diagnosis as "[disorder] spine," secondary diagnosis as "obesity" and "other alleged impairments" as "[high blood pressure]." Id. at 303. Dr. McNeil opined that Plaintiff was

16

able to lift and carry twenty pounds occasionally and ten pounds frequently, was able to stand and/or walk for a total of four hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. Id. at 304. Dr. McNeil opined that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes, or scaffolds. Id. at 305. Dr. McNeil assigned Plaintiff one visual limitation, stating that Plaintiff had limited far acuity and specifying, "[g]ross vision. If this produces an allowance, will need best corrected vision." Id. at 306. Dr. McNeil wrote:

> Allegations are partially credible. Has impairment that can produce back pain. Severity, intensity and functional limitation are not as severe as alleged. Function report – does personal care, takes care of children – one is 14 months old, prepares quick meals, does dishes, folds laundry, vacuuming hurts arms, drives, shops in stores, handles finances, watch TV a little 2/2 depression, no social activities, difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing & using hands; also problem [with] memory, concentration following instructions & getting along [with] others. Reports no HHAD. Severity of problems as described would require ambulation aid & [treating physician] sources (of which there are two) do not report[] pain or need for surgical intervention which would be recommended [with] level of severity reported.

Id. at 308.

Dr. McNeil concluded, "I have reviewed all the evidence in file and the assessment of 7/11/2011 is affirmed as written." Id. at 310.

On July 2, 2012, Plaintiff cancelled an appointment with Dr. Fakhruddin. Id. at 319. On July 5, 2012, Plaintiff cancelled an appointment with Dr. Fakhruddin because she was "having car trouble." Id. On July 9, 2012, Dr. Fakhruddin's records indicate that Plaintiff was "still seeing shadow – gets worse when get stressed out. Has been out of her med – it got worse." Id. The note states that Plaintiff had missed two appointments due to car trouble, and that her boyfriend was going to fix the car but was now incarcerated; Plaintiff "feels angry at him as she needs help taking care

of the baby." Id. It is not clear from the record whether Plaintiff presented for this appointment or had a telephone conversation.

On July 17, 2012, Plaintiff visited Nashville Health Services with complaints of knee and ankle pain. Id. at 351-52. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with walking, mood, and sleep, "moderate interference" with relations with other people, ability to concentrate, stamina, and sexual activity, and "no interference" with riding in an automobile, recreational activities, and appetite. Id. at 352. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On August 6, 2012, Dr. Fakhruddin completed a questionnaire regarding Plaintiff's treatment. Id. at 317-18. Dr. Fakhruddin wrote that Plaintiff had been a patient for twenty months and had improved with treatment, specifically, Plaintiff "[d]oes not loose (sic) temper, stable mood, ... denial of auditory hallucinations." Id. at 317. Dr. Fakhruddin reported that Plaintiff was prescribed three "psychotropic medications:" Abilify, Tegretol, and Xanax. Id. Dr. Fakhruddin wrote that Plaintiff had a "moderate impairment" in memory, concentration, and social ability and that Plaintiff was truthful in reported her psychiatric complaints. Id. Dr. Fakhruddin also opined that Plaintiff could "[r]emember and carry out simple, 1-2 step instructions and maintain a work routine without frequent breaks for stress related reasons;" could not "[m]aintain an ordinary work routine without inordinate supervision," and wrote that specifically Plaintiff "can't do regular housework;"

could "[m]aintain socially appropriate behavior, hygiene and grooming;" could not "[r]espond appropriately to normal stress and routine changes" because she "get[s] overwhelmed;" could "[c]are for self and maintain independence in daily living tasks on a sustained basis;" could not "[m]aintain a work schedule without missing frequently due to psychological issues" and could "manag[e her] own funds." Id. at 318.

On August 14, 2012, Plaintiff visited Nashville Health Services with complaints of knee and ankle pain. Id. at 349-50. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with relations with other people, mood, sleep, and "over all enjoyment of life," "moderate interference" with walking, riding in an automobile, ability to concentrate, stamina, sexual activity and appetite, and "no interference" with recreational activities. Id. at 350. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a seven. Id. Plaintiff reported that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On August 21, 2012, Rebecca Joslin, Ed.D. completed a "psychiatric review technique." Id. at 322-34. Dr. Joslin based her review on Plaintiff's "affective disorders," specifically "bipolar." Id. at 322 and 325. Dr. Joslin opined that Plaintiff would experience a "mild" limitation in "restrictions of daily living," and a "moderate" limitation in "difficulties in maintaining social functioning" and "difficulties in maintaining concentration, persistence, or pace." Id. at 332. Dr. Joslin concluded that Plaintiff's "report of [symptoms] [was] credible, capable, able to care for self, childcare, household and community needs. [N]o [suicidal ideation] or psychosis, based on all

19

evidence in file, [moderate] limits, consistent with [medical analysis] of [treating] source which is given great weight." Id. at 334.

On August 21, 2012, Dr. Joslin also completed a mental RFC. Id. at 335-37. Dr. Joslin assigned Plaintiff a "moderate" limitation in her "ability to maintain attention and concentration for extended periods," "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "ability to interact appropriately with the general public," "ability to accept instructions and respond appropriately to criticism from supervisors," "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" and "ability to respond appropriately to changes in the work setting;" in all other areas, Dr. Joslin opined that Plaintiff was "not significantly limited." Id. at 335-36. Dr. Joslin concluded that Plaintiff was "able to understand and remember simple and detailed instructions," "able to maintain attention, concentration, persistence and pace for above tasks with approp[riate] breaks despite periods of increased signs and [symptoms]," "interaction with gen[eral] public and coworkers should be on occasional basis, [f]eedback should be given in supportive manner," and "able to adapt to infrequent changes in the workplace." Id. at 337.

On August 29, 2012, Dr. Nathaniel Briggs conducted a case analysis of Plaintiff's medical records. Id. at 338. Dr. Briggs noted that there was "no worsening, no new limitations, no new conditions" and that the updated medical evidence of record was "limited to treatment for mental [symptoms]." Id. Dr. Briggs concluded, "[a]fter reviewing the [medical evidence of record], the initial assessment of 6/14/12, which adopts the ALJ decision of 7/11/11, is considered to be correct, and is affirmed as written." Id.

On September 13, 2012, Plaintiff visited Nashville Health Services with complaints of lower back pain, knee pain and ankle pain. Id. at 347-48. Plaintiff admitted that she was a tobacco user. Id. at 347. Plaintiff was fitted for a backbrace and was given a TENS unit for pain. Id. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with recreational activities, relations with other people, mood, ability to concentrate, stamina, sexual activity, sleep, and "over all enjoyment of life," "moderate interference" with walking, riding in an automobile, and appetite, and did not mark "no interference" for any activity. Id. at 348. Plaintiff wrote that her "pain level at its worst during the past week" was a ten and "at its best" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On September 21, 2012, Plaintiff visited Dr. Bonnaire "for outer ear infection, bleeding and pus, cold chills, headaches, dizziness." Id. at 372-73. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. at 372. Plaintiff was diagnosed with "[i]nfective otitis externa, unspecified," "[o]besity," "[a]llergic rhinitis due to other allergen," "[u]nspecified essential hypertension," and "[h]ypopotassemia." Id. Plaintiff was prescribed Amoxicillin, an anti-infection, and Zyrtec, an anti-histamine; Plaintiff was also noted to be taking Cimetidine, an anti-acid, Atenolol, a beta-blocker, Abilify, an anti-psychotic, Tegretol, a mood stabilizer, and Hydrochlorothiazide, a blood pressure medication, although none of these were prescribed on this visit. Id. at 373.

On September 24, 2012, Dr. Bonnaire's office called Plaintiff and left a message stating that she needed to "call office ASAP, her potassium level is low she needs to get the [prescription] that was sent to the [pharmacy] and come back into the office on Thursday for a repeat on her labs." Id. at 371.

On September 27, 2012, Plaintiff cancelled an appointment at Dr. Fukhruddin's office. Id. at 363. On October 1, 2012, Plaintiff visited Dr. Fukhruddin's office and spoke about her boyfriend, who was "not working much." Id.

On October 11, 2012, Plaintiff visited Nashville Health Services. Id. at 345-46. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "severe interference" with recreational activities, relations with other people, mood, ability to concentrate, stamina and sleep, "moderate interference" with walking and riding in an automobile, and "no interference" with "general," sexual activity, appetite, and "over all enjoyment of life." Id. at 346. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On October 29, 2012, Plaintiff cancelled an appointment at Dr. Fakhruddin's office. Id. at 363.

On October 31, 2012, Dr. Bonnaire's office called Plaintiff and left a message stating that she "needs to come in for a potassium and magnesium level." Id. at 370.

On November 1, 2012, Plaintiff visited Dr. Fakhruddin's office and "said she has been under

22

the weather." Id. at 363. Plaintiff reported that she "got rid of her man," although he still came by to visit their daughter, and that Plaintiff was having financial problems. Id.

On November 13, 2012, Plaintiff visited Sheena Jordan, NP at Dr. Bonnaire's office for "disease management and follow up on low potassium. ... Only complaint is increase[d] GERD symptoms." Id. at 368-69. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness" and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. at 368. Plaintiff was diagnosed with "[h]ypopotassemia" and "[e]sophageal reflux." Id. Plaintiff was prescribed Omeprazole, a medication for GERD, and was counseled to take potassium and modify "diet & exercise." Id. at 369.

On November 14, 2012, Plaintiff visited Nashville Health Services. Id. at 343-44. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with mood, ability to concentrate, stamina and sleep, and "no interference" with "general," walking, riding in an automobile, recreational activities, relations with other people, sexual activity, appetite, and "over all enjoyment of life." Id. at 344. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On November 16, 2012, Dr. Bonnaire's office called Plaintiff and sent a letter to Plaintiff's home regarding an "abnormal lab" and a prescription for potassium. Id. at 367.

On November 29, 2012, Plaintiff visited Dr. Fakhruddin's office and stated that she "did not have problems [recently]" but was out of her medication, Abilify. Id. at 363.

On December 12, 2012, Plaintiff visited Nashville Health Services. Id. at 341-42. Plaintiff completed a quality of life questionnaire and wrote that, due to her pain, she experienced "moderate interference" with walking, riding in an automobile, recreational activities, relations with other people, mood, ability to concentrate, stamina, sexual activity, appetite and sleep, and "no interference" with "general" or "over all enjoyment of life." Id. at 342. Plaintiff wrote that her "pain level at its worst during the past week" was a ten, "at its best" was a five, and "over all during the past week" was a five. Id. Plaintiff reported that current treatment was "making a difference" in her life and that her pain was exacerbated by "coughing[,] sneezing[,] bending[,] reaching[,] turning head[,] getting in and out of a chair[,] turning over in bed [and] change in weather" and alleviated by "exercise[,] heat[,] cold[,] massage [and] rest." Id.

On December 27, 2012, Plaintiff visited Dr. Fakhruddin's office and "said she is doing alright." Id. at 362.

On February 20, 2013, Dr. Stacy Dorris conducted a consultative examination for Tennessee Disability Determination Services. Id. at 378-85. The alleged diagnoses were "[d]egenerative disc disease, depression, bipolar, high blood pressure, leg pain, knee pain, and nerve damage." Id. at 378. Plaintiff reported that "her most disabling issue is secondary to her back. Overall, she has had back pain for 8 to 9 years and has been diagnosed with degenerative disc disease and scoliosis." Id. Plaintiff also reported pain that radiates into her legs, nerve pain, and foot pain. Id. Plaintiff stated that she had tried several treatment options that were unsuccessful, including an epidural, "some injections in her spine," "some sort of spray-on medication" and physical therapy, although "[a]t this

24

time, she does not do any particular strengthening or stretching exercises." Id. Plaintiff did state that she was taking pain medications. Id. Dr. Dorris noted that Plaintiff "does have significant obesity and has had so since her 20s." Id.

Plaintiff reported that she "currently smokes five cigarettes per day. She started smoking in her 20s and at most smoked one pack per day." Id. at 379. Plaintiff also stated that she "last worked in 2007 at the YMCA." Id. Plaintiff reported taking the following medications: Percocet, a narcotic pain medication, Xanax, an anti-anxiety, Atenolol, a beta blocker, Hydrochlorothiazide, a blood pressure medication, Tegretol, a mood stabilizer, Prilosec, a heartburn medication, and Potassium. Id. Upon examination, Plaintiff was "[i]n no apparent distress, well appearing." Id. In a range of motion test, Plaintiff's "effort was good" and the test showed "full range of motion. She could perform fine manipulation and gross dexterous maneuvers." Id. Plaintiff also underwent a range of motion test of the lumbar spine, that "showed full range of motion except in flexion to 75 degrees with complaints of pain." Id. Plaintiff's "[g]ait and station w[ere] stable" and her "[m]uscle strength testing was 5/5 in all major muscle groups. She was able to tiptoe, heel, and complete a tandem walking. She could squat fully. She could perform a tight fist and her grip strength was within normal limits. Her sensation remained intact." Id.

Dr. Dorris listed Plaintiff's diagnoses as "[d]egenerative disc disease of the lower back," "[c]hronic pain in the legs and bilateral knees in the setting of significant obesity" and "[h]igh blood pressure." Id. at 381. Regarding Plaintiff's knee pain, Dr. Dorris wrote, "[h]er obesity is likely adding to her chronic knee condition. She reports that her left knee is edematous today, but I was unable to appreciate that on physical exam." Id. at 382. Dr. Dorris concluded:

Based on the objective evidence, the claimant appears capable of sitting for 4 hours

out of an 8-hour day. This is secondary to her degenerative disc disease. She appears able to stand and walk for 4 hours out of an 8-hour day with adequate breaks. This is secondary to what are likely osteoarthritic changes in her bilateral knees and radiculopathy secondary to her degenerative disc disease. Her gait was within normal limits and she was able to ambulate without an assistive device. She could perform gross and fine manipulation of objects. Secondary to her back disease, her ability to [lift] and carry would be limited to 20 pounds occasionally and 10 pounds continuously. She could operate a motor vehicle. Her ability to work from heights and operate heavy machinery will be limited secondary to her back disease. She could hear and understand normal conversational speech and she communicated and socialized adequately. She would not have environmental restrictions at this time. Aside from the above-noted restrictions, the claimant appears functionally intact.

Id.

Dr. Dorris "defer[red] regarding [Plaintiff's] psychiatric concerns today" as Plaintiff "reports that she has had an exam with SSA mental health specialist." Id.

Dr. Dorris also completed a medical source statement. Id. at 386-90. Dr. Dorris opined that Plaintiff could lift and carry up to ten pounds continuously and eleven to twenty pounds occasionally, due to "[degenerative disc disease] of spine." Id. at 386. Dr. Dorris opined that Plaintiff could sit, stand, and walk for up to four hours at one time without interruption and could sit, stand, and walk for a total of six hours in an eight-hour workday due to "[degenerative disc disease] = radiculopathy." Id. at 387. Dr. Dorris opined that Plaintiff could use her right hand to reach, including overhead, frequently, could frequently push/pull with her right and left hands, and could occasionally handle, finger, and feel with her right and left hands; these restrictions were attributed to "[degenerative disc disease]." Id. at 388. Dr. Dorris opined that Plaintiff could never climb ladders or scaffolds, could occasionally kneel, crouch or crawl, could frequently climb stairs and ramps and stoop, and could continuously balance; these restrictions were attributed to "[degenerative disc disease] = radiculopathy." Id. at 389. Dr. Dorris limited Plaintiff to never being exposed to unprotected heights, occasionally being exposed to moving mechanical parts and vibrations, and

continuously being exposed to operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, and extreme heat; these restrictions were attributed to "[degenerative disc disease] = radiculopathy." Id. at 390.

On March 6, 2013, Dorothy Lambert, Ph.D.[2] conducted a consultative examination. Id. at 393-97. Plaintiff reported her physical medical history, and also stated that "she has mental health problems and is being treated by Dr. Fakhrud[i]n. She claims her diagnoses are Bipolar Disorder, Depression, and Posttraumatic Stress Disorder. She described symptoms of feeling anxious when she is in crowds. She said that she cries a lot. She gets upset and angry easily. It started after her [motor vehicle] accident. She added that she feels anxious because she has had no permanent place to live and no money since her boyfriend has been incarcerated. However, she has recently been approved for public housing. She did not bring her medication but reported that she takes Tegretol (200mg x 2), Xanax (1mg x 1), and several other medications that she could not remember the names of." Id. at 393. Plaintiff reported that "her last job was in 2007. She said she had worked in child care at the YMCA for two years but was laid off because of her back problems. Prior to that she worked at two hotels about two months at each place. She worked at the front desk but felt overwhelmed and quit each job. She also worked at three different day cares a few months at each place." Id. at 394.

Plaintiff admitted to "seeing shadows" but stated that "she knows no one is there." Id. Plaintiff denied suicidal ideation, homicidal ideation, and verbal hallucinations. Id. According to Plaintiff, "all of her days are the same," and consist of the following:

---

[2]This report is written on the stationary of Thelma Foley, Ed.D. and it is signed by both Dr. Foley and Dorothy Lambert, Ph.D. Parties refer to the examination as being conducted by Dr. Lambert, and the Court will as well.

She reported that she gets up around noon. She gets her child up and bathes, dresses, and feeds her. She then does her personal grooming. She added that she takes her medication and has to rest about forty-five minutes for it to take effect. She does household chores including washes dishes, cleans the bathroom, and does laundry. She said she mainly eats frozen microwave dinners or brings food in. She added, 'I can't stand or sit very long.' She sits on the couch and plays with her daughter or reads to her. She also watches television.

Ms[.] Starks said she has a couple of friends that she talks to on the phone but does not get to see them. On rare occasions she goes out to eat but she added that is not too often because it causes her anxiety. She also goes to the grocery store and the doctor's office.

According to Ms[.] Starks she used to be happy. She went places such as to the movies, danced, and hung out with friends. She went on vacations. She added, 'I lived life like you are supposed to.'

Id. at 394-95.

Dr. Lambert concluded, "[Plaintiff] would be able to understand and remember instructions. Her concentration and persistence today were adequate. She would be able to maintain appropriate grooming. She would have difficulty relating to people in a work setting because of her anxiety and depression. She would be aware of normal hazards and would be able to travel independently." Id. at 395.

Dr. Lambert also completed a medical source statement. Id. at 396-98. Dr. Lambert assigned Plaintiff a "mild" limitation in the ability to carry out complex instructions, the ability to make judgments on complex work-related decisions, the ability to interact appropriately with the public, the ability to interact appropriately with supervisors, and the ability to interact appropriately with co-workers. Id. at 396-97.

On March 8, 2013, Plaintiff visited Middle Tennessee Health and Wellness for a followup. Id. at 412-13. Plaintiff reported that "'the meds are working better now that he changed them.'" Id.

28

at 412. Plaintiff reported low back pain, nerve pain, and bilateral knee paint that was a "5/10" with medication and a "10/10" without medication. Id. Upon examination, Plaintiff showed "[n]o depressive [symptoms], change in sleep habits, no [suicidal ideation] or [homicidal ideation]." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," and "[d]egeneration of lumbar or lumbosacral intervertebral disc." Id. at 413. Plaintiff was prescribed Percocet, a narcotic pain medication. Id.

Plaintiff completed an intake assessment. Id. at 414-19. Plaintiff wrote that she "stay[ed] healthy" with a "positive attitude," "exercise," and "[appointments]" and coped with pain by using "showers, rest, frequent movement." Id. at 415. Plaintiff also stated that she slept for only three hours a night and that her sleep was disrupted by pain. Id. at 416. Plaintiff wrote that she had the following "depression symptoms:" social isolation, helplessness, labile mood, fatigue, crying episodes, anger, agitation, concentration problems – this was marked both present and not present – loss of libido, hopelessness, irritability, memory deficits, and low self-esteem. Id. Plaintiff wrote that she had the following "manic symptoms:" more talkative than usual or pressure to keep talking and distractibility. Id. at 417. Plaintiff wrote that she had the following "anxiety symptoms:" hypervigilance, restlessness, agoraphobia, flashbacks, excessive worry, feeling scared or fearful all the time, constant fear of losing control, social avoidance, and low tolerance for frustration. Id. Plaintiff reported visual hallucinations, specifically "shadows," that she saw "rarely." Id. at 418.

On April 8, 2013, Plaintiff visited Middle Tennessee Health and Wellness and stated "'the meds work really well for me.'" Id. at 420-21. Plaintiff complained of lower back pain, nerve pain in both legs, and bilateral knee pain but reported that the pain was alleviated by her medication. Id. at 420. Plaintiff reported that today her pain was a five, that since treatment began her pain at worst

had been a nine, and that her pain was tolerable with the current treatments. Id. Plaintiff stated that she felt "[m]ore drained" since her last visit. Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," and "[d]egeneration of lumbar or lumbosacral intervertebral disc." Id. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id. at 421.

On May 8, 2013, Plaintiff visited Karen Kastler, APN at Middle Tennessee Health and Wellness for a followup appointment. Id. at 422-23. Plaintiff complained of lower back pain, nerve pain in both legs, and bilateral knee pain. Id. at 422. Plaintiff reported that her pain on medication was at a five out of ten, without medication was at a ten out of ten, and that five was a tolerable pain level. Id. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness" and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," "[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

On June 5, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and Wellness for a followup appointment. Id. at 424-25. Plaintiff complained of lower back and knee pain, and stated that her pain was at a level of five out of ten with medication and ten out of ten without medication. Id. at 424. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg,"

"[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at 425. Plaintiff was "feeling better" and her "Bipolar [wa]s under control." Id. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

On June 26, 2013, Plaintiff visited Dr. Shahana Huda at Panacea Psychiatric Center "to be established as a new patient since her psychiatrist has retired couple of months ago." Id. at 404-06. Plaintiff reported as her history that "her depression started after she lost her mother in 1996," that she "has been having nightmares [and] flashbacks" about childhood abuse, that she "reports feeling anxious and having panic attacks when she is around a crowd" and has a "history of manic episodes lasting 3-4 days causing relationship problem. She reports occasional visual hallucinations." Id. at 404. Plaintiff reported smoking five cigarettes per day. Id. Plaintiff was observed to have a "euthymic" mood and a "broad" affect, and was "organized" and "goal directed." Id. at 405. Plaintiff was considered to have all cognitive faculties, including orientation "x3," immediate recall "3/3," recent memory "3/3," remote memory "intact," concentration "5/5," abstract reasoning "good," intelligence "average," insight "good" and judgment "good." Id. Plaintiff was prescribed Tegretol "for mood" and Xanax "as [needed] for anxiety." Id. at 406.

On July 3, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and Wellness for a followup appointment. Id. at 426-27. Plaintiff complained of lower back, knee pain, and nerve pain in both legs, and stated that her pain was at a level of five out of ten with medication and ten out of ten without medication. Id. at 426. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower

31

leg," "[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at 427. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

On July 23, 2013, Plaintiff visited Dr. Huda at Panacea Psychiatric Center complaining "that she felt irritable and drowsy taking Buspar but she continued taking it for over 2 weeks then she stopped taking it due to side effects. Otherwise, she has no issues. She reports having frequent mood swings. Anxiety is stable on [] xanax[.]" Id. at 407-08. Upon examination, Plaintiff's mood was "depressed with a broad range of affect," but no other symptoms were noted. Id. at 407. Plaintiff was diagnosed with depression that was "not stable," anxiety that was "improving," and insomnia that was "ongoing." Id. Plaintiff was noted to be "nicotine dependen[t] and her prescription for Buspar was changed to Tegretol. Id.

On August 2, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and Wellness for a followup appointment. Id. at 428-29. Plaintiff complained of lower back and knee pain, and stated that her pain was at a level of five out of ten with medication and ten out of ten without medication. Id. at 428. Plaintiff reported that since her last appointment, she had "a hard time playing with her daughter, [t]ired all the time" but also reported that she had seen "improvement" since her last visit. Id. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," "[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at 429. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

On August 20, 2013, Plaintiff visited Dr. Huda at Panacea Psychiatric Center and "report[ed]

feeling much better since the dose of Tegretol has been increased during the last visit." Id. at 409.

Plaintiff reported "occasional agitation," but stated that her anxiety was stable on Xanax and she was

sleeping well with Trazodone. Id. Upon examination, Plaintiff showed no symptoms. Id. Plaintiff

was diagnosed with depression that was "improving," anxiety that was "improving," and insomnia

that was "stable." Id. Plaintiff's current medications were continued. Id.

On August 30, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and

Wellness for a followup appointment. Id. at 430-31. Plaintiff complained of lower back and knee

pain, and stated that her pain was at a level of five out of ten with medication and ten out of ten

without medication. Id. at 430. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no

limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no

changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with

"[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg,"

"[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at

431. Plaintiff stated that her "pain meds help with lumbar pain but at this time nothing is really

helping with her right knee pain. [Plaintiff] has appointment with orthopaedist next week. Imaging

is scheduled." Id. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed.

Id.

On September 17, 2013, Plaintiff visited Dr. Huda at Panacea Psychiatric Center and

"report[ed] worsening depression and anxiety over the past 2-3 weeks. She says that she avoids

going to stores due to feeling anxious and paranoid about people. She reports having multiple

stressors such as dealing with her disability case, having financial problems, and frequent arguments

with her fiancé." Id. at 410. Plaintiff reported that she "needs to take at least 1 pill of Xanax" daily.

Id. Upon examination, Plaintiff's mood was "depressed with a dysphoric affect" and there was "retardation noted," but otherwise Plaintiff showed no symptoms. Id. Plaintiff was diagnosed with "Bipolar 1 Disorder, most recent episode mixed, severe with psychotic features" and "Post Traumatic Stress Disorder." Id. Plaintiff's dosage of Tegretol was increased and Plaintiff was prescribed Effexor, "for anxiety and depression." Id.

On September 27, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and Wellness for a followup appointment. Id. at 432-33. Plaintiff complained of lower back and knee pain, and stated that her pain was at a level of five out of ten with medication and ten out of ten without medication, except that today her right knee was a ten out of ten. Id. at 432. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," "[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at 433. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

On October 20, 2013, Karen Kastler, ACND-BC completed a medical source statement. Id. at 399-400. Kastler described Plaintiff's symptoms as "pain in joints (especially knees), low back pain, midback pain, dizziness, stiffness, chronic ache, numbness ... weakness, instability, fatigue" and diagnosed Plaintiff with "lumbago, scoliosis, joint pain, degenerative disc disease, gastritis, sciatica." Id. at 399. Kastler opined that Plaintiff's symptoms were severe enough to interfere with attention and concentration frequently. Id. Kastler opined that Plaintiff would need to "recline, lie down, and/or absent [herself] in excess of the typical [breaks]," that Plaintiff could sit, stand and

34

walk for less than two hours in an eight-hour workday, and that Plaintiff would need to alternate sitting and standing. Id. Kastler opined that Plaintiff could never lift and carry any weight, could never climb, stoop, kneel, crawl or balance, but could occasionally crouch. Id. at 399-400. Kastler limited Plaintiff's environmental exposure to heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibrations, but opined that Plaintiff could be exposed to noise. Id. at 400. Kastler based these restrictions on "swelling in joints (esp knees), radiculopathy to buttocks, decreased [range of motion], retropattelar grind, effusion, pos[itive] anterior drawers." Id. Kastler estimated that Plaintiff would be absent from work "more than 4 times per month," the highest category. Id.

On October 22, 2013, Plaintiff visited Dr. Huda at Panacea Psychiatric Center and "report[ed] worsening depression and anxiety over the past couple of months." Id. at 411. Plaintiff did not fill her prescription for Effexor "which was prescribed for anxiety and depression" due to an insurance issue, and reported that she "needs to take at least 1 pill of Xanax" daily and "tries to take less Xanax but she could not do it due to overwhelming anxiety." Id. Upon examination, it was noted that Plaintiff had "[m]oderate psychomotor retardation" and her mood was "anxious with a dysphoric affect." Id. Otherwise, Plaintiff showed no symptoms. Id. Plaintiff was diagnosed with "Bipolar 1 Disorder, most recent episode mixed, severe with psychotic features" and "Post Traumatic Stress Disorder." Id. Plaintiff's prescriptions were continued and she was referred to a psychotherapist. Id.

On October 22, 2013, Dr. Huda also completed a "medical assessment of ability to do work-related activities (mental)." Id. at 401-03. Dr. Huda opined that Plaintiff had a "good" ability to follow work rules, deal with the public, use judgment, function independently, and maintain attention

and concentration, a "fair" ability to relate to co-workers, and a "poor" or "no ability" to interact with supervisors and deal with work stresses. Id. at 401. In support of these limitations, Dr. Huda wrote, "[Plaintiff] has social anxiety. She has trouble going to crowded places such as stores due to paranoid thoughts about people and panic attacks." Id. Dr. Huda opined that Plaintiff had a "good" ability to understand, remember and carry out simple job instructions, and a "fair" ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. Id. at 402. Dr. Huda opined that Plaintiff had a "good" ability to maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability, and a "fair" ability to relate predictably in social situations. Id. Dr. Huda wrote that Plaintiff would "likely be absent from work more than 2 days per month due to mental issues." Id.

On October 25, 2013, Plaintiff visited Karen Kastler at Middle Tennessee Health and Wellness for a followup appointment. Id. at 434-35. Plaintiff stated that "[Tenn]Care has denied request for MRI of Right Knee. Pain and swelling continue – [Plaintiff] is increasingly becoming more inactive." Id. at 434. Plaintiff complained of lower back pain and right knee pain, and stated that her pain was at a level of six out of ten with medication and ten out of ten without medication. Id. Upon examination, Plaintiff had "[n]o pain in muscles or joints, no limitation of range of motion[,] no parathesias or numbness," and "[n]o depressive symptoms, no changes in sleep habits, no changes in thought content." Id. Plaintiff was diagnosed with "[l]umbago," "[s]coliosis [and kyphoscoliosis], idiopathic," "[p]ain in joint involving lower leg," "[d]egeneration of lumbar or lumbosacral intervertebral disc" and "[g]astritis and duodenitis." Id. at 435. Plaintiff's prescription for Percocet, a narcotic pain medication, was renewed. Id.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) giving significant weight to the opinions of Dr. Dorothy Lambert and Dr. Frank Kupstas, who are not treating physicians, and little to no weight to the opinions of treating physicians Dr. Fakhruddin and Dr. Huda and (2) discrediting Plaintiff's treating source, Karen Kastler, and giving significant weight to consultative examiner Stacy Dorris.

Plaintiff first contends that the ALJ erred by violating the treating physician rule by assigning the treating source statements of Drs. Fahkruddin and Huda "little weight," citing 20 CFR 404.1527(c)(2): "[g]enerally, we give more weight to opinions from your treating sources ... If we

find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."

As an initial matter, the notes from Dr. Fakhruddin's office are hand-written and nearly illegible. Further, it appears that neither medication nor additional treatment were ever prescribed by Dr. Faakhruddin's office. On August 6, 2012, Dr. Fakhruddin completed a questionnaire regarding Plaintiff's treatment. (Docket Entry No. 11, Administrative Record, at 317-18). Dr. Fakhruddin wrote that Plaintiff had been a patient for twenty months and had improved with treatment, specifically, Plaintiff "[d]oes not loose (sic) temper, stable mood, ... denial of auditory hallucinations." Id. at 317. Dr. Fakhruddin reported that Plaintiff was prescribed three "psychotropic medications:" Abilify, Tegretol, Xanax." Id. It is not clear whether Dr. Fakhruddin's office prescribed these medications, or whether Plaintiff reported them from another office; however, when Dr. Huda took over Plaintiff's psychiatric care, Dr. Huda did prescribe them. Id. at 406.

Dr. Fakhruddin restricted Plaintiff in several areas, opining that: Plaintiff had a "moderate impairment" in memory, concentration, and social ability; could "[r]emember and carry out simple, 1-2 step instructions and maintain a work routine without frequent breaks for stress related reasons;" could not "[m]aintain an ordinary work routine without inordinate supervision," and wrote that specifically Plaintiff "can't do regular housework;" could "[m]aintain socially appropriate behavior, hygiene and grooming;" could not "[r]espond appropriately to normal stress and routine changes" because she "get[s] overwhelmed;" could "[c]are for self and maintain independence in daily living tasks on a sustained basis;" could not "[m]aintain a work schedule without missing frequently due

to psychological issues" and could "manag[e her] own funds." Id. at 317-18.

Yet according to treatment notes, Plaintiff never discussed any of these issues. Id. at 321, 320, 319, 363. Plaintiff spoke mostly about her boyfriend and relationship problems. Id. Plaintiff also sometimes reported pain and what the provider deemed "stress," and reported feeling "angry" because her boyfriend was in jail. Id. at 320, 319. According to treatment notes, Plaintiff never discussed any of the limitations listed by Dr. Fakhruddin in the statement.

Further, after the August 6, 2012 statement, Plaintiff reported improvement. Following the August 6, 2012 statement, Plaintiff visited Dr. Fakhruddin's office three times and cancelled one appointment. At a November 29, 2012 appointment with Dr. Fukhruddin's office, Plaintiff reported that she "did not have problems [recently]." Id. at 363. At a December 27, 2012 appointment with Dr. Fukhruddin's office, Plaintiff "said she is doing alright." Id. at 362.

In the Sixth Circuit, "[p]rovided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 240 (6th Cir. 2002) (quoting Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985)). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987). Regarding Dr. Fakhruddin's statement, the ALJ wrote that "Dr. Fakhruddin's treatment notes show no objective observations and give no plan of treatment to support such a restrictive medical source statement." (Docket Entry No. 11 at 32). Because Dr. Fakhruddin's restrictions are not consistent with any note made during Plaintiff's treatment, it was reasonable for the ALJ to assign Dr. Fukhruddin's statement only "little weight." Further, because Plaintiff's condition improved after Dr. Fakhruddin's wrote the statement,

it was reasonable for the ALJ to determine that the opinion was no longer accurate.

On October 22, 2013, Dr. Shahana Huda of Panacea Psychiatric Center completed a "medical assessment of ability to do work-related activities (mental)." Id. at 401-03. Dr. Huda opined that Plaintiff had a "good" ability to follow work rules, deal with the public, use judgment, function independently, and maintain attention and concentration, a "fair" ability to relate to co-workers, and a "poor" or "no ability" to interact with supervisors and deal with work stresses. Id. at 401. In support of these limitations, Dr. Huda wrote, "[Plaintiff] has social anxiety. She has trouble going to crowded places such as stores due to paranoid thoughts about people and panic attacks." Id. Dr. Huda opined that Plaintiff had a "good" ability to understand, remember and carry out simple job instructions, and a "fair" ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. Id. at 402. Dr. Huda opined that Plaintiff had a "good" ability to maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability, and a "fair" ability to relate predictably in social situations. Id. Dr. Huda wrote that Plaintiff would "likely be absent from work more than 2 days per month due to mental issues." Id.

Plaintiff began visiting Dr. Huda at the Panacea Psychiatric Center on June 26, 2013, after Dr. Fakhruddin's retirement. Id. at 404-06. During her first appointment, Plaintiff reported many issues that had not previously been recorded in her medical record, including nightmares and flashbacks that were diagnosed as Post Traumatic Stress Disorder and manic episodes lasting three to four days that were diagnosed as bipolar disorder. Id. At this appointment, Plaintiff had a euthymic mood and a broad affect – both considered "normal" – "organized" and "goal directed" thinking and all cognitive faculties. Id.

On July 23, 2013, Plaintiff reported than one of her medications was causing her to be

irritable and drowsy, but that "[o]therwise, she has no issues." Id. at 407-08. Plaintiff reported that Xanax was keeping her anxiety "stable" and displayed a broad affect. Id. at 407.

On August 20, 2013, Plaintiff reported that she was "feeling much better" since her medications were changed, and that despite "occasional agitation," her anxiety remained stable on Xanax. Id. at 409. Plaintiff showed no symptoms upon examination, and her depression and anxiety were deemed "improving" and her insomnia was "stable." Id.

On September 17, 2013, Plaintiff's situation changed dramatically. Id. at 410. Plaintiff reported that she "needs to take at least 1 pill of Xanax" every day due to anxiety, stress, and paranoia. Id. Upon examination, there was "retardation noted," although on June 26, her intelligence was noted to be "average" and as a strength she was noted to be "educated;" on July 23, there was "no retardation noted" and on August 20 there was no "retardation noted." Id. at 410, 405-06, 407, 409. At this appointment, Plaintiff was prescribed Effexor "for anxiety and depression," however, on October 22, Plaintiff admitted that she did not fill the prescription. Id. at 410, 411.

On October 22, 2013, the date of the medical source statement, Plaintiff again reported a severe decline in her condition. Id. at 411. As of this appointment, Plaintiff reported "worsening depression and anxiety over the past couple of months," and stated again that she needed "at least" one Xanax per day and that she "tries to take less Xanax but she could not do it due to overwhelming anxiety." Id. Plaintiff was again noted to have retardation, specifically, "[m]oderate psychomotor retardation" and was noted to be anxious. Id. Plaintiff was referred to a psychotherapist, although there is no record of Plaintiff attending a psychotherapy appointment. Id.

The ALJ determined that Dr. Huda's medical source statement was "overly pessimistic in light of the treatment notes, which show improvement with medication." Id. at 32. The ALJ also

wrote, "Dr. [Huda's] mental status exams were normal, hardly supportive of such a limited medical source statement. Further, the claimant's reported activities indicate she is not as limited as the doctors opined." Id. The ALJ also noted that Plaintiff cancelled several appointments with mental health providers, and that Plaintiff reported that "Xanax decreased her mood swings and irritability;" in support of these contentions, the ALJ cited records from Dr. Huda's office. Id. at 33. As with the opinion of Dr. Fakhruddin, the ALJ reasonably assessed that Dr. Huda's opinion should be given "little weight" because it was not consistent with treatment records that demonstrate stability and improvement. See Gault v. Comm'r of Soc. Sec., 535 Fed.App'x 495, 496 (6th Cir. 2013) (ALJ properly "rejected the conclusion that Gault had marked mental limitations on the basis that it conflicted with her benign clinical examinations, conservative course of treatment, and daily activities. Thus, viewed in context, the ALJ adequately explained that he accepted Allred's opinion that Gault had some mental limitations, but rejected that those limitations were disabling.")

Plaintiff also finds error in the weight the ALJ assigned to the opinions of Dorothy Lambert, Ph.D. and Frank Kupstas, Ph.D. These were state examiners who did not have a treating relationship with Plaintiff. An ALJ is required to consider opinion evidence given by state agencies and to explain the weight given. "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants ... the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist[.]" 20 C.F.R. § 404.1527(e)(2)(i) and (ii).

On April 30, 2012, Dr. Kupstas completed three sets of records review. First, Dr. Kupstas completed a "medical consultant analysis" and determined that a "[s]ignificant change

(improvement/worsening/new impairment) did occur," specifically, "[Plaintiff] presents [with] depressive [symptoms] – and current op psy[chiatric] [treatment] [is] [prescription] regimen from psychiatrist. Able to perform wide range of [activities of daily living] independently. Based on p[re]ponderance of [medical evidence of record], significant change did occur. ALJ decision (non-severe) is not adopted." (Docket Entry No. 11 at 291).

Dr. Kupstas also completed a "psychiatric review technique" and opined that Plaintiff had a mild limitation in "restriction of activities of daily living" and "difficulties in maintaining social functioning," and a moderate limitation in "difficulties in maintaining concentration, persistence, or pace." Id. at 287.

Dr. Kupstas listed another set of restrictions in a mental RFC. Id. at 295-97. Regarding concentration, Dr. Kupstas stated again that Plaintiff was "moderately limited" in her "ability to maintain attention and concentration for extended periods" but that Plaintiff was "able to maintain [concentration, persistence, and pace] for low-level detailed tasks over a normal workday [with] appropriate breaks." Id. at 295-97. Dr. Kupstas also limited Plaintiff in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" although he found Plaintiff "able to adapt to routine changes in the workplace." Id. at 295-97. Dr. Kupstas' extensive consideration of Plaintiff's record is consistent with treatment notes that show a stable condition and conservative treatment. Therefore, it was reasonable for the ALJ to assign his opinion "significant weight."

On March 6, 2013, Dorothy Lambert, Ph.D. conducted a consultative examination. Id. at

43

393-97. Plaintiff described her symptoms as: "feeling anxious when she is in crowds. She said that she cries a lot. She gets upset and angry easily. " Id. at 393. Plaintiff admitted to "seeing shadows" but stated that "she knows no one is there." Id. Plaintiff reported her activities of daily living as follows:

> She reported that she gets up around noon. She gets her child up and bathes, dresses, and feeds her. She then does her personal grooming. She added that she takes her medication and has to rest about forty-five minutes for it to take effect. She does household chores including washes dishes, cleans the bathroom, and does laundry. She said she mainly eats frozen microwave dinners or brings food in. She added, 'I can't stand or sit very long.' She sits on the couch and plays with her daughter or reads to her. She also watches television.

> Ms[.] Starks said she has a couple of friends that she talks to on the phone but does not get to see them. On rare occasions she goes out to eat but she added that is not too often because it causes her anxiety. She also goes to the grocery store and the doctor's office.

> According to Ms[.] Starks she used to be happy. She went places such as to the movies, danced, and hung out with friends. She went on vacations. She added, 'I lived life like you are supposed to.'

Id. at 394-95.

Based on her observations and Plaintiff's self-reported history and activities of daily living, Dr. Lambert concluded that Plaintiff "would be able to understand and remember instructions" – specifically, Plaintiff had a "mild" limitation in the ability to carry out complex instructions – and that Plaintiff showed "adequate" concentration and persistence. Id. at 395, 396-97. Although Dr. Lambert wrote that Plaintiff "would have difficulty relating to people in a work setting because of her anxiety and depression," Dr. Lambert also opined that Plaintiff would have only a "mild" limitation in the ability to interact with the public, supervisors, and co-workers. Id.

The ALJ concluded that Dr. Lambert's "opinion is largely supported by the medical evidence,

including the treatment notes" so he assigned "significant weight to the extent consistent with the record." Dr. Lambert met with Plaintiff, and based her conclusions on Plaintiff's own report of her symptoms and activities of daily living. The ALJ was required to consider this opinion and it was not error for the ALJ to assign it "significant weight."

Next, Plaintiff alleges that the ALJ erred by assigning "significant weight" to the opinion of Stacy Dorris, an examining physician, and only "little weight" to Karen Kastler, who Plaintiff claims is a "treating source."

Karen Kastler is a Nurse Practitioner at Middle Tennessee Health and Wellness. Plaintiff visited Middle Tennessee Health and Wellness ten times between April 5, 2013 and October 25, 2013, and during her final seven visits, Plaintiff was treated by Kastler. Id. at 412-35. Social Security regulations define a "treating source" as an "acceptable medical source" who has had an ongoing treatment relationship with a patient. 20 C.F.R. §§ 404.1502, 416.902. "Acceptable medical sources" include many types of licensed medical providers, but do not include nurse practitioners. See 20 C.F.R. §§ 404.1513(a), 416.913(a). Because Kastler is a nurse practitioner, she does not qualify as a "treating source" under SSA regulations and Plaintiff's reliance on this designation is misplaced.

Acceptable medical sources are addressed in SSR 06-3p. This ruling provides that ALJs should evaluate opinions from "other sources" who have seen an individual in their professional capacity using the same factors they use to evaluate opinions from "acceptable medical sources." Such factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5)

45

whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. See 20 C.F.R. §§ 404.1513(a), 416.913(a).

In considering Kastler's opinion, the ALJ wrote that "her opinion is not consistent with the medical evidence, which reveals conservative, effective treatment for the claimant's alleged physical impairments. Accordingly, her opinion is given little weight." (Docket Entry No. 11 at 30). During her time at Middle Tennessee Health and Wellness, Plaintiff regularly reported that medication reduced her pain level to a five out of ten – and Plaintiff stated that five out of ten was a "tolerable level of pain" – and that she was happy with her current doses and frequency. Id. at 412, 422, 424, 426, 428, 430 and 432. While at Middle Tennessee Health and Wellness, Plaintiff was prescribed Percocet, a narcotic pain medication, that she claimed "work[ed] really well for me" and helped her "feel[] better." Id. at 420 and 425.

In August 2013, Plaintiff began to complain that she had "a hard time playing with her daughter" and was "tired all the time." Id. at 428. Yet even with these complaints, Plaintiff agreed that she had seen "improvement" since her last visit. Id. At another appointment in August 2013, Plaintiff clarified that although the "pain meds help with lumbar pain," "nothing is really helping with her right knee pain" so Plaintiff had an appointment scheduled with an orthopaedist for imaging. Id. at 431. There is no record of Plaintiff attending this appointment, and Plaintiff later stated that "[Tenn]Care has denied request for MRI of Right Knee." Id. at 434. On September 27, 2013, Plaintiff again stated that her pain was a five out of ten, but the pain in her right knee was a ten out of ten. Id. at 432. Once again, there was no more aggressive treatment discussed, and Plaintiff's prescription for Percocet was renewed. Id. at 433.

Despite Plaintiff's low pain level, satisfaction with treatment, and conservative medication-only treatment history, Kastler opined that Plaintiff's symptoms were severe enough to interfere with attention and concentration frequently, that Plaintiff would need to "recline, lie down, and/or absent [herself] in excess of the typical [breaks]," that Plaintiff could sit, stand and walk for less than two hours in an eight-hour workday, and that Plaintiff would need to alternate sitting and standing, that Plaintiff could never lift and carry any weight, could never climb, stoop, kneel, crawl or balance, but could occasionally crouch, and that Plaintiff would be absent from work "more than 4 times per month," the highest category. Id. at 399-400.

These restrictions are not consistent with Plaintiff's treatment records. Plaintiff's complaints were treated with prescription medication, and no more aggressive treatment was ordered. "In terms of medical care, it is proper to classify taking prescription medications and receiving injections as 'conservative' treatment." Hauser v. Comm'r of Soc. Sec., 2014 WL 48554 at *9 (S.D. Ohio Jan. 7, 2014). See also, Cordell v. Astrue, 2010 WL 446944 at *7, 12, 15 (E.D. Tenn. Feb. 2, 2010) (narcotic pain medication such as Percocet and psychotropic medications are "conservative treatment"). Further, Plaintiff stated that her pain with medication was tolerable at a five out of ten and that she was happy with the medication and did not want to change her dosage. Considering these factors, it was reasonable for the ALJ to determination that Kastler's medical source statement was not consistent with Plaintiff's medical record, statements, and history of conservative treatment.

Plaintiff also finds error in the ALJ's assignment of "significant weight" to the opinion of Stacy Dorris, a consultative examiner. Upon examination, Dr. Dorris observed that Plaintiff was "[i]n no apparent distress, well appearing." (Docket Entry No. 11 at 379). In a range of motion test, Plaintiff's "effort was good" and the test showed "full range of motion. She could perform fine

47

manipulation and gross dexterous maneuvers." Id. Plaintiff also underwent a range of motion test of the lumbar spine, that "showed full range of motion except in flexion to 75 degrees with complaints of pain." Id. Plaintiff's "[g]ait and station w[ere] stable" and her "[m]uscle strength testing was 5/5 in all major muscle groups. She was able to tiptoe, heel, and complete a tandem walking. She could squat fully. She could perform a tight fist and her grip strength was within normal limits. Her sensation remained intact." Id. Regarding Plaintiff's knee pain, Dr. Dorris wrote, "[h]er obesity is likely adding to her chronic knee condition. She reports that her left knee is edematous today, but I was unable to appreciate that on physical exam." Id. at 382. Dr. Dorris concluded:

> Based on the objective evidence, the claimant appears capable of sitting for 4 hours out of an 8-hour day. This is secondary to her degenerative disc disease. She appears able to stand and walk for 4 hours out of an 8-hour day with adequate breaks [Dr. Dorris clarified that Plaintiff could sit, stand, and walk for a total of six hours in an eight-hour workday. Id. at 387.] This is secondary to what are likely osteoarthritic changes in her bilateral knees and radiculopathy secondary to her degenerative disc disease. Her gait was within normal limits and she was able to ambulate without an assistive device. She could perform gross and fine manipulation of objects. Secondary to her back disease, her ability to [lift] and carry would be limited to 20 pounds occasionally and 10 pounds continuously. She could operate a motor vehicle. Her ability to work from heights and operate heavy machinery will be limited secondary to her back disease. She could hear and understand normal conversational speech and she communicated and socialized adequately. She would not have environmental restrictions at this time. Aside from the above-noted restrictions, the claimant appears functionally intact.

Id.

Dr. Dorris also completed a medical source statement. Id. at 386-90. Dr. Dorris opined that Plaintiff could use her right hand to reach, including overhead, frequently, could frequently push/pull with her right and left hands, and could occasionally handle, finger, and feel with her right and left hands; that Plaintiff could never climb ladders or scaffolds, could occasionally kneel, crouch or

crawl, could frequently climb stairs and ramps and stoop, and could continuously balance. Id. at 388-90.

The ALJ determined that "Dr. Dorris examined the claimant and her opinion is consistent with the record, including the lumbar spine MRI and treatment notes. Therefore, it is given significant weight." Id. at 30. As discussed previously, Plaintiff's medical record and statements show that her pain was adequately treated with pain medication and conservative treatment. Therefore, the ALJ did not err in finding that Dr. Dorris' opinion reflected these facts and assigning Dr. Dorris' opinion "significant weight."

Although the ALJ did not err in consideration of these opinions, the Court finds that the ALJ did err in assigning Plaintiff "no limitations in social interaction" in her RFC. Id. at 29. Plaintiff has a documented history of social issues. Plaintiff self-reported both "social isolation" and "social avoidance." Id. at 416-17. There are also multiple mentions of Plaintiff's social issues from treating and consultative sources: Dr. Kupstas assigned Plaintiff a mild limitation in "difficulties in maintaining social functioning;" Dr. Fakhruddin assigned Plaintiff a moderate impairment in "social ability;" Dr. Joslin assigned Plaintiff a moderate limitation in "social functioning;" Dr. Huda wrote that Plaintiff had "social anxiety;" and Dr. McNeil reported that Plaintiff had "no social activities." Id. at 287, 317, 332, 308 and 401. Plaintiff also reported that she "feel[s] anxious and ha[s] panic attacks when she is in a crowd," and Dr. Huda wrote that Plaintiff "has trouble going to crowded places such as stores due to paranoid thoughts about people and panic attacks." Id. at 404 and 401. Social interaction is an important component of the RFC. See Gonzalez v. Colvin, 2014 WL 1333713 at *9 (N.D. Ohio March 28, 2014) ("Here, the record supports Plaintiff's contention that the ALJ erred by failing to incorporate restrictions related to the frequency and intensity of Plaintiff's

social intereactions in to the ALJ's RFC determination."). As such, the ALJ's determination regarding Plaintiff's social interaction was in error.

Accordingly, the Court concludes that the ALJ erred by finding that Plaintiff had no limitations in social interaction. As such, the ALJ's decision is not supported by substantial evidence and should be reversed and Plaintiff's motion for judgment on the record (Docket Entry No. 13) should be granted in part.

An appropriate Order is filed herewith.

**ENTERED** this the ___1st___ day of __July__ 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge